**UNITED STATES of America, Plaintiff,**

v.

**Collin W. BUCHANAN, Defendant.**

**No. 89–CR–13–C.**

United States District Court,
W.D. Wisconsin.

Nov. 1, 1989.

Asst. U.S. Atty. Jeffrey Anderson, Madison, Wis., for plaintiff.

Donald J. Murphy, Madison, Wis., for defendant.

## ORDER

CRABB, Chief Judge.

This case is before the court on defendant's objection to a supplemental Report and Recommendation entered by the United States Magistrate on September 19, 1989. In an earlier report, the magistrate had recommended denial of defendant's motion to suppress evidence discovered in a search of his motel room, on the ground that the evidence would have been discovered inevitably even if the prior illegal search had not taken place, because probable cause existed for the issuance of a warrant to search the room. I agreed with the magistrate that law enforcement offi-

cers would have sought a search warrant even if they had not undertaken a preliminary illegal search, but I remanded the case to him for further development of the record because I could not determine whether the officers would have had probable cause to obtain such a warrant from an independent judicial officer.

Because defendant's objections to the magistrate's first report were filed late, I did not remand the case until after the trial on the merits at which defendant was found guilty. Sentencing has been delayed awaiting the filing of the magistrate's report and the defendant's objections.

The magistrate conducted an additional evidentiary hearing, after which he filed his supplemental report in which he concluded that the officers would have had probable cause for the issuance of a warrant to search the motel room even without the discovery of drugs during their first search. Alternatively, he concluded, defendant freely and voluntarily consented to the removal of his property from his motel room.

After reviewing the magistrate's report, the supplemental record, and the defendant's objections, I am prepared to adopt the magistrate's proposed findings of fact and conclusions of law.

I agree with the magistrate that the evidence in defendant's motel room would have been discovered inevitably even if the first unlawful search had not taken place, because the officers would have sought and obtained a warrant to search defendant's motel room for the murder weapon. Although there is some confusion in the record about the time at which the officers in Madison knew that the murder weapon had not been recovered, it is not necessary to resolve that issue. Counsel stipulated that what was known by the Columbus police could be considered to be known by the officers in Madison. Therefore, the Madison police are assumed to have known that the gun had not been recovered. Such an assumption is logical. The obvious thing for the Madison police to have done after taking defendant into custody and sealing the motel room was to call Columbus to report the arrest and discuss whether to seek a warrant for a search of the room.

In the order entered on May 16, 1989, I expressed some doubt whether the Madison police had had probable cause to believe that the murder weapon would be found in the motel room, in part because of the commonsense notion that murderers do not retain their weapons. *United States v. Charest,* 602 F.2d 1015, 1017 (1st Cir.1979). The magistrate's supplemental Report and Recommendation deals persuasively with this issue. I agree with him that under the circumstances present in this case, there was a fair probability both that defendant had retained the gun *and* that it would be in the motel room.

I agree also that defendant voluntarily and intelligently consented to the officers' proposal that they pack up and remove his clothes and other property from the motel room. The evidence does not support defendant's position that he agreed to the removal only because he was misled about what would happen if he did not agree. As the magistrate pointed out, defendant's disagreement with the officers about what would happen refutes his claim that he based his consent on their supposed misrepresentation.

## ORDER

IT IS ORDERED that defendant's motion to suppress the evidence seized in the search of his motel room on January 12, 1989 is DENIED.

With the denial of this motion, sentencing of the defendant can proceed promptly. Sentencing will take place at 1:30 p.m., Friday, November 17, 1989. If counsel have not yet filed objections to the presentence report, they are to do so no later than November 7, 1989.

## REPORT AND RECOMMENDATION (ON REMAND)

JAMES GROH, United States Magistrate Judge.

Defendant was charged with possession with intent to distribute cocaine and moved to suppress evidence found in his motel room at the time of his arrest on January

12, 1989. Following an evidentiary hearing I recommended, in a Report and Recommendation entered April 21, 1989, that defendant's motion be denied on the ground that, whether or not illegally obtained, the evidence would inevitably have been discovered through a lawful search for the murder weapon allegedly used by defendant in committing a murder in Columbus, Ohio, on December 6, 1988. (Dkt. # 33) Ruling on defendant's objection to the recommendation, the Honorable Barbara B. Crabb remanded the matter for further hearing on the question whether a judicial officer would have issued a warrant for the search of defendant's motel room. (Order, pp. 4–5; Dkt. # 44)

A supplemental evidentiary hearing was held at which the government offered the testimony of Detective Michael Elkins of the Columbus, Ohio, Police Department, and Detectives Richard Pharo and James Grann of the Madison Police Department.

■ From the evidence adduced at the hearing I conclude that the government has sustained its burden of proving there was available to the officers sufficient untainted information from which a neutral and detached judicial officer could and would have found probable cause to believe that the murder weapon or other evidence material to the murder would be discovered in a search of defendant's motel room at the time the allegedly unlawful intrusion occurred. *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984); *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472

(1988). That the evidence sought to be suppressed would have been discovered in the conduct of that search is beyond dispute.[1]

## ADDITIONAL FINDINGS OF FACT [2]

I find that the following information was actually known to the Madison Police Department or the Columbus, Ohio, Police Department at the time of the allegedly unlawful search of defendant's apartment when he was arrested on January 12, 1989.[3]

On December 6, 1988, Kevin Evans died in Columbus, Ohio, of five gunshot wounds to the chest and stomach. Detective Michael Elkins of the Columbus Police Department was assigned to investigate the killing.[4] Investigation of the crime scene produced a number of shell casings but the murder weapon was never found. Ballistics tests and witness accounts indicated that the shells were .380 caliber fired from a 9 millimeter or .380 caliber semi-automatic handgun.

Defendant was identified as the shooter by two eyewitnesses who knew him by the name "Silver." Another witness saw defendant running away from the crime scene, gun in hand. The eye witnesses were drug users and dealt drugs for defendant whom they identified as a crack cocaine dealer. They and other witnesses knew defendant to carry a 9 mm. handgun or a .38 caliber Derringer. They said the reason for the shooting was a $200 drug debt. At the time of the murder, defendant was reportedly wearing a red and

---

**1.** Judge Crabb also left open the alternative of considering the other grounds for suppression not reached in the original recommendation. (Order p. 5) I have done so and also conclude, as alternative grounds for denial of the motion, that defendant gave his voluntary consent to the search. (See Part II, *infra,* p. 1215.)

**2.** These findings pertain to the inevitable discovery issue. They are in addition to those stated in the original Report and Recommendation. Further findings appear at p. 1215, *infra.*

**3.** It was agreed in advance of the evidentiary hearing that the information in the possession of the Columbus, Ohio, authorities at the time of

the search was available to the Madison police and may properly be considered in determining whether probable cause existed at that time for the issuance of a warrant to search for the murder weapon. (Tr: 5–7, Dkt. # 46) This conforms to the established rule that information known to other law enforcement officers or agencies may properly be considered in the probable cause calculus. See *United States v. Hensley,* 469 U.S. 221, 231, 105 S.Ct. 675, 681, 83 L.Ed.2d 604 (1985); *United States v. Longmire,* 761 F.2d 411, 415–416 (7th Cir.1985).

**4.** The account of the crime and investigation is derived principally from Elkins' testimony.

black silk shirt and a brown coat of suede, sheepskin or leather.

One of defendant's distinguishing marks was a long scar on his right cheek left by a gunshot wound received in a multiple-victim restaurant shooting in Columbus in August, 1988. Defendant gave the name Roger Buchanan on that occasion.

Det. Elkins learned defendant's identity through a police records check and photographic identifications were obtained. The records revealed that defendant was on parole from earlier convictions in New York. Defendant had been convicted, at age 18, of felonious sale and possession with intent to sell controlled substances on January 5, 1987. He received a two to six year sentence. See Ct.Ex. 3.

Within a few hours of the killing, defendant took a Columbus taxi eastward to Zanesville, Ohio, a distance of fifty-six miles. The taxi driver told Det. Elkins he had known defendant (as "Silver") for some time. Defendant had first asked to be driven to Cincinnati (109 miles southwest of Columbus) and said he wanted to catch an eastbound bus. The driver suggested Zanseville as it was closer and had fewer police.

On the day of the crime Det. Elkins obtained a warrant for defendant's arrest (Ct.Ex. 2) for the murder of Kevin Evans, and filed a wanted person report containing information about the investigation with the National Crime Information Center. (NCIC) (Gov't. Ex. 1) The report included a warning that defendant might be armed with a 9 mm. or .38 caliber handgun and was to be considered dangerous. This information was published nationwide through the NCIC computer network.[5]

Det. Elkins had completed his interviews and prepared his report on the crime prior to January 12, 1989.

The Madison Police Department first came into contact with defendant (under the names "Nitty" and Darryl T. Bailey) on December 23, 1988, when a complainant reported to Det. Heitzke that "Nitty" was holding a woman against her will at Purlie's Bar and would not release her unless she came up with $500.[6] The complainant added that "Nitty" was in possession of a large amount of crack. Enroute to the tavern, "Nitty" was seen driving a red Nissan automobile. In the ensuing stop, he was arrested for driving without a license and underage drinking, but the alleged victim denied she was being held hostage. "Nitty" produced a social security card and a document from Henderson, North Carolina, identifying him as Darryl T. Bailey.[7] He told Heitzke he had been in Madison for about a week.

Investigation confirmed that "Nitty" had permission to drive the vehicle which was registered to a Betty Watson. Det. Heitzke also noted that "Nitty" was in possession of "a very large amount of currency" and he had a fresh scar on his right cheek. He was photographed and fingerprinted at the Dane County Jail before being released on bail.

On January 4 and again on January 9, 1989, Det. Pharo received telephone tips from anonymous callers. (Gov't Ex. 3, p. 1) The first stated that a Jamaican operating out of a small red car and known as "Ned" or "Nitty" was selling cocaine at Purlie's Tavern and in the area of the Somerset Apartments. The caller also said Nitty was offering to trade cocaine for a 9 mm. handgun.[8] The second tipster said a black male from New York state was trafficking cocaine in the Magnolia Lane area and had shown the informant a plastic bag containing a large quantity of crack cocaine. He said the dealer drove a small red car.

---

**5.** The NCIC computer contains the posted information of outstanding felony investigations to facilitate cooperation and the exchange of information among law enforcement agencies.

**6.** Det. Heitzke's detailed report of this episode was marked Def. Ex. # 1 in the original evidentiary hearing.

**7.** A search of his wallet revealed another Social Security card in the name of Damon N. Edwards. A search of the car revealed neither drugs nor weapons.

**8.** According to Det. Pharo, guns and drugs go hand in hand.

Having read Det. Heitzke's report, Det. Pharo sent the fingerprints taken upon the arrest of "Nitty"/Darryl Bailey to the FBI on January 11, 1989. The FBI responded by wire the next day and identified the fingerprints as those of defendant Collin Wayne Buchanan, a native of Jamaica. (Gov't Ex. 2) The message stated that defendant was:

> WANTED FOR DRUG–RELATED HOMICIDE IN COL[UMBU]S OHIO[.] MAY BE ARMED WITH 9 MM AND 38 CAL HANDGUN[.] MURDER WARRANT ON FILE[.]

At about the same time Det. Pharo received the information from the NCIC file and learned of defendant's prior drug convictions in New York. See Gov't Ex. 3. Pharo also spoke to Det. Elkins in Columbus, Ohio, about defendant and learned more about the crime and that the murder weapon had not been found. *Id.* p. 2.[9]

Detective Pharo then organized a search for defendant. Defendant was spotted sometime later by Det. Grann who followed him to the Road Star Motel where he was arrested at about 10:50 p.m.[10]

## CONCLUSIONS OF LAW

### I. *Inevitable Discovery*

The first issue before me on remand is a narrow one. In the original Report and Recommendation, I recommended (Report pp. 13–16) that defendant's motion to suppress be denied because the evidence "unlawfully" discovered[11] in his motel room would inevitably have been discovered independently through lawful means—a search upon warrant for the murder weapon.[12] *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984) (The challenged evidence will be received "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means....") See also *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). The burden in this instance would be to show by a preponderance of the evidence that a warrant could and would have been obtained without regard to any antecedent illegality. See *United States v. Silvestri,* 787 F.2d 736, 744–745 (1st Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988).

That the police would have sought the warrant may be taken as established.[13] Nevertheless, defendant urges that *Nix* does not apply because no law enforcement authorities were actually seeking a warrant at the time the illegal search occurred.

---

**9.** Det. Elkins' testimony conflicted with that of Det. Pharo on this point, in that Elkins recalled that the call came *after* defendant had been arrested. I accept Det. Pharo's version. His police report (Gov't Ex. 3, p. 2) and his testimony at the first hearing both placed the conversation before the arrest. It also seems infinitely more plausible that a police officer would try to find out as much as possible about a suspect before confronting him, rather than after. Finally, the Madison Police Department telephone record tends to corroborate Pharo's recollection. The only telephone call to the Columbus area on January 12 and 13 of more than 4 minutes length occurred at 7:36 p.m. on January 12 and lasted for 13 minutes. I think it is irrelevant, in any event, whether Pharo learned about the weapon before or after the arrest. The Columbus Police Department knew the weapon had not been found and that is all that matters, since their knowledge was at all times available to the MPD and may be deemed the knowledge of the MPD for present purposes.

**10.** The facts concerning the arrest and search are set forth in the original Report and Recommendation, pp. 3–5, and will not be repeated. A considerable portion of the proof at the supplementary hearing dealt with the events following the arrest and search. Those facts are not relevant to the immediate inquiry which is necessarily directed only to evidence available to the police prior to the entry into the room.

**11.** For purposes of this discussion only, it is assumed that the officer's entry into defendant's room to pack his belongings was in violation of his Fourth Amendment rights.

**12.** As the officers acknowledged at the original hearing that they had no probable cause to search the room for drugs, no need exists to discuss that alternative.

**13.** "I agree with the Magistrate that it would have been predictable and proper police procedure for the officers to seek a warrant to search defendant's motel room for weapons and guns." Order, p. 4. (Dkt. # 44) That the murder weapon was a proper subject of a search warrant is also undisputed. Order p. 5.

(Def.Supp. Br. at 3–4 (Dkt. # 52); Repl. Br. at 2 (Dkt. # 55)) While some earlier cases did impose an actual pursuit requirement (see discussion in *United States v. Silvestri*, 787 F.2d 736, 745–746 (1st Cir.1986)), the theory was impliedly rejected in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). In that case agents investigating drug trafficking unlawfully entered a warehouse, smelled marijuana and observed several bales believed to contain the substance. They left the warehouse and subsequently applied for a warrant based upon independent evidence. As Justice Marshall emphasized in his dissent, the agents had made no effort to obtain a warrant, or even discussed it, prior to the initial (unlawful) entry. *Murray*, 108 S.Ct. at 2537.[14]

Although I believe it is clear that Judge Crabb's order settles the question, it bears repeating that, but for the allegedly unlawful search, the officers would have sought a warrant for the murder weapon. Indeed, it is inconceivable that they would not have done so. It is equally obvious that that decision would not, and could not, have been influenced by the results of the illegal search as it yielded only evidence of an unrelated crime (drug dealing) and none bearing on the murder or the murder weapon.

The only remaining question, and the one specifically returned for further hearing and recommendation, is

> whether the information [the police] possessed was sufficient to persuade a neutral and detached magistrate that the murder weapon … would be found *in defendant's motel room.* [emphasis added]

(Order p. 4, Dkt. # 44) For this inquiry the only information that may be considered is that known to the Madison Police Department (or available to them through official sources, particularly the Columbus Police Department) before the alleged misconduct occurred.[15] The government presented an impressive quantity of probative (and uncontradicted) evidence, and there cannot be much question about the existence of probable cause with regard to the underlying criminal conduct, the killing of Kevin Evans, or defendant's involvement in that crime. Indeed, one judicial officer had already issued a warrant for defendant's arrest for that offense. Through Det. Elkins' testimony we see defendant identified as the person who committed the crime in the presence of eyewitnesses and who was observed fleeing the scene with gun in hand. Within a matter of hours he took flight to parts unknown by unconventional, surreptitious means, and turned up in Madison several days later.

That the weapon used in killing Kevin Evans was evidence of a crime, and thus the proper subject of a search warrant, is not disputed. The problem lies in where the gun was to be found. The supplemental hearing revealed little hard evidence about the murder weapon or its disposition. Defendant was seen to commit the murder with a handgun and run away with it. Ballistics tests revealed it to be either a 9 mm. or a .380 caliber semiautomatic weapon. That is the last that is known of it. There is no direct evidence that it even reached Madison, let alone defendant's motel room, and defendant argues that considerations of time and distance make it unlikely that it did. To this must be added the point noted by Judge Crabb

> that common sense suggests that murderers do not retain their murder weapons in these days when "ballistics is not only an accurate science, it is also well known." *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir.1979).

The probable cause analysis must begin with the Supreme Court's decision in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

---

**14.** The case was remanded because the district court did not "explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse." *Murray*, 108 S.Ct. at 2536.

**15.** This approach conforms to the standard suggested by *Murray*, 108 S.Ct. at 2535–2536; it excludes any possibility of the probable cause determination being contaminated by the tainted product of the allegedly unlawful search. See also n. 3, *supra.*

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of a crime will be found in a particular place.

*Id.* at 238, 103 S.Ct. at 2332 (emphasis added).[16] More directly to the point is the observation of Justice (then Judge) Kennedy:

For probable cause to exist, a magistrate need not determine that the evidence sought is *in fact* on the premises to be searched ... or that the evidence is more likely than not to be found where the search takes place.... *The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.*

*United States v. Peacock,* 761 F.2d 1313, 1315 (9th Cir.1985), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985). (emphasis added in part) (citations omitted).

While I acknowledge that plausible arguments may be advanced on the other side of the proposition, I conclude that there was probable cause to believe that the murder weapon would be found in defendant's motel room and that, based upon the evidence before me, an impartial magistrate would have issued a warrant for the search.

In the particular circumstances of this case, I do not believe that this conclusion contradicts the common sense wisdom of *Charest.* While the principle may be true in general, that case does not hold that the potential for ballistic identification invariably negates the retention of the murder

weapon by the murderer or that a murderer would never hide the weapon in his or her own home. The element of presence, like the other elements of probable cause, is to be derived from the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

[It] is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

*Id.* at 232, 103 S.Ct. at 2329. Indeed, the court in *Charest* said as much:

[T]he nexus between the objects to be seized and the premises searched do not have to rest on direct observation, but can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide a handgun used in the commission of a murder.

*Charest,* 602 F.2d at 1017.

The evidence presented at the evidentiary hearing distinguishes this case from *Charest* in several important respects. Unlike the defendant in *Charest,* defendant here had taken flight. He was far removed from the area of the crime and using a false identity. The place to be searched was not an established home or residence with which he was openly identified, but a temporary shelter where he was registered under an assumed name. The conventional wisdom upon which *Charest* relies has less application here. Defendant was himself concealed. He did not expect to be found, and there is no reason to think that he would not have felt the same way about the murder weapon.[17] In these circumstances his retention of it would not

---

**16.** I do not read *Nix* to require a preponderance of the evidence standard for the issuance of the warrant by the magistrate, but rather that the facts which would have been presented to the magistrate be established by a preponderance of the evidence. See *Nix,* 467 U.S. at 444–445, n. 5, 104 S.Ct. at 2509, n. 5.

[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings.

**17.** Det. Elkins' testimony on this point is instructive. He noted that, in his experience, not all murder suspects dispose of the weapon, and suggested that the decision to retain it was related to the degree to which they felt secure from apprehension.

have exposed him to the obvious sort of risk with which the court in *Charest* was concerned.

While defendant may be assumed to know about the science of ballistics, it seems highly unlikely that the risk of ballistic identification would have weighed very heavily in the decision to discard or retain the gun, assuming defendant thought about it at all. Ballistics evidence is used primarily to tie the weapon, and, circumstantially, the suspect, to the crime. In the instant case, Det. Elkins testified there were a number of eyewitnesses to the murder and its immediate aftermath. When the murder is openly committed in the presence of others, getting rid of the weapon is less of a priority, since ballistics can do no more than corroborate the publicly known fact.[18] This is especially true when, as discussed below, there are strong countervailing incentives to retain the weapon.

Given defendant's background, the circumstances of the murder and his subsequent behavior, it was, to my mind, more likely than not that he would have retained the murder weapon. He did not remain in Columbus to protest his innocence. He took flight immediately. One traveling in fugitive status is highly vulnerable and is necessarily constrained in movement and activity. The value of a firearm to such a person cannot be underestimated. It may be required to resist apprehension, to secure money or services by force, or to fill perceived needs for self-protection.[19] To my mind, defendant's immediate need for a gun and the security it afforded would have greatly outweighed the more remote risk of self-incrimination through ballistics evidence.

There is still another reason for defendant to retain the gun. From what we know of him, he is no stranger to the world of crime. The only evidence of his involvement in income producing activity is as a drug dealer. He was convicted and sentenced to prison in New York for drug possession and distribution. On parole release, he had apparently established himself in the drug trade in Columbus. The murder itself had its origin in a drug debt. Within a week of his arrival in Madison, he is identified as dealing drugs and was found to be in possession of a large amount of cash, one of the marks of the business. Given the universal recognition that guns are tools of the drug trade (see *United States v. Alvarez,* 860 F.2d 801, 829–830 (7th Cir.1988), *cert. denied,* 490 U.S. 1051, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989), (and cases cited); *United States v. Serna–Barreto,* 842 F.2d 965, 967 (7th Cir.1988)), it seems highly improbable that defendant would have gone without a weapon—at least until he had an opportunity to replace it, and there is no evidence that he did.

Nothing is known of defendant during the 10 days between the murder and his surfacing in Madison, but the difficulty and uncertainty of acquiring a replacement weapon cannot be overlooked. As a convicted felon wanted for murder and parole violation, conventional sources were obviously closed to him. One may assume that weapons are available from illicit sources, but not so readily, one may assume, to a fugitive in transit. The only evidence that exists on the point is the anonymous telephone report received by Det. Pharo that defendant was trying to trade cocaine for a 9 mm. gun a few days before his arrest. This suggests that the weapon had not been replaced. Granted that the report was anonymous, it is not entirely without credibility. See *Illinois v. Gates,* 462 U.S. at 241–242, 103 S.Ct. at 2333–2334. It was the second report of drug dealing by defendant and at the time the information was provided, his wish to acquire a 9 mm. gun was of no special significance beyond the implication that he might be dangerous.[20]

---

**18.** The police, of course, would place a higher value on finding the weapon because witnesses may become uncooperative, disappear or forget important details.

**19.** Self defense against retaliation for the murder of Evans provided still another, perhaps the most persuasive, reason for keeping the weapon.

**20.** Defendant places great weight on the fact that no gun was found in the December 23 search of defendant and the car he was driving.

The foregoing considerations lead me to conclude that at the very least there was a "fair probability" that the murder weapon would be found in defendant's motel room; that it would have been "reasonable" under the circumstances to look for it there. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332; *Peacock*, 761 F.2d at 1315. Unlike *Charest*, this finding does not rest solely upon the naked assumption that it would be found there because it was defendant's residence. His fugitive status provided an overriding motive to retain the weapon and his anonymity and the difficulty of replacement of the weapon argue against his disposing of it. To this is added the business necessity of armament in the drug trade. Accordingly, I find that the government has sustained its burden of proof and that a neutral and impartial magistrate would have issued a warrant to search the motel room for the gun.

## II. *The Consent Issues*

### *Additional Findings of Fact*

In discussing with defendant what he wanted done with his clothes, Det. Pharo had not formed, and did not act with, the purpose or motive of obtaining defendant's assent to an unwarranted search of defendant's motel room. Det. Pharo did not intend to mislead defendant, and did not make a false statement, when he told defendant that none other than the police or the management of the motel would have access to the room following defendant's arrest.

Defendant freely and voluntarily assented to the removal of his property from his room by the police.

### *Conclusions of Law*

While I have concluded in Part I that the motion to suppress should be denied under the doctrine of inevitable discovery, I propose also to take up the questions left unresolved on the original Report and Rec-

ommendation, one of which has been clarified by a recent decision of the Court of Appeals.

In the original Report (pp. 8–9), I noted my inclination toward the view that suppression may be in order because the government had obtained defendant's consent to the "search" in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This tentative position was based on the fact that defendant's consent was obtained while he was in custody and before he was informed of his constitutional rights. Since then the Court of Appeals, in *United States v. Glenna*, 878 F.2d 967 (7th Cir. 1989), has pointed out the error in that premise, holding expressly that *Miranda* does not apply to a consent to search.

> A consent to search is not the type of incriminating statement toward which the fifth amendment is directed. It is not in itself "evidence of a testimonial or communicative nature."

*Glenna*, 878 F.2d at 971 (quoting *United States v. Lemon*, 550 F.2d 467, 472 (9th Cir.1977)). I accordingly withdraw the reservation previously stated in this regard.

The remaining question is whether the government has met its burden of proving that defendant's consent was voluntary. The standard here is well-established. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). *United States v. Rojas*, 783 F.2d 105, 107 (7th Cir.), *cert. denied*, 479 U.S. 856, 107 S.Ct. 195, 93 L.Ed.2d 127 (1986). But consent will not be found to be involuntary in the absence of official coercion. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).[21] ("[C]oercive police

---

I do not agree. It is just as likely that defendant knew he had been reported and had removed all contraband from the car. In any event, it is not necessary, in establishing probable cause, to negate every non-nefarious fact or inference.

*United States v. Fleming*, 677 F.2d 602, 605–606 (7th Cir.1982).

**21.** Although *Connelly* involved the voluntariness of incriminating statements and waiver of *Miranda* rights, the principle applies equally in all

activity is a necessary predicate" to a finding that consent is involuntary.) The proscribed coercion may be "by explicit or implicit means, by implied threat or covert force" or it may be subtle. *Schneckloth*, 412 U.S. at 228, 93 S.Ct. at 2048.

> In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.

*Id.* at 229, 93 S.Ct. at 2049.

■ It is against this background that defendant's claim must be analyzed. I also previously expressed the tentative belief that the government had not met its burden. (Report pp. 12–13) The two reasons for this view were (1) concern that Det. Pharo's question about defendant's clothing may have been motivated by a desire to create an opportunity to confirm a suspicion that defendant had drugs in his room, and (2) that Det. Pharo misled defendant when he (Pharo) said that defendant would not be able to have someone else collect his things from the room. Upon further reflection, I am of the opinion that those conclusions were not supported by the evidence and now conclude, after considering all the relevant facts and circumstances, that defendant's decision to have the police collect his clothing and personal effects from his room was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception" on the part of the police. *Connelly*, 479 U.S. at 170, 107 S.Ct. at 523; *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047.

■ At the outset, a semantic error of sorts should be noted as it tends to skew analysis. It has been the practice of all

contexts. *Schneckloth*, 412 U.S. at 223–227, 229, 93 S.Ct. at 2045–2048, 2049.

**22.** It has not been suggested that defendant expected (or could reasonably expect) that he would be permitted to pack his things in privacy. Nor could it be argued that the officers should have granted him that privilege given the offense for which he was arrested.

concerned to refer to this as a consent to search case, but that label implies too much. It assumes (1) an underlying motive or purpose on the part of the police to search the room, (2) a request by the police to do so, (3) defendant's consent to that request, and (4) a search. The facts provide little support for those assumptions. There is simply no evidence of a request to *search* the room or of a consent to a *search*. Rather, defendant was asked what *he* wanted to do with his clothes, and his "consent" was, in fact, his direction to Det. Pharo that he wished to take his property with him. Det. Pharo acceded to that request and directed the officers to pack up defendant's things.[22] Whether a search occurred depends upon the state of mind of the officers and relates back to the underlying motivation. That aside, the mere act of collecting and packing defendant's property at his direction is hardly a search in the ordinary sense of seeking evidence of a crime, *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047, even though the act of packing necessarily exposed defendant's effects to plain view observation.

The foregoing clarification illuminates the real issues in the case: whether the police introduced the subject of the disposition of defendant's personal effects with the object and purpose of gaining access to the contents of his room and whether defendant's assent to that access was the product of deceptive or coercive police misconduct.

I have found as fact that Det. Pharo's actions were not prompted by any improper motive or purpose. While he had some reason to suspect defendant of drug dealing, defendant was tracked down and arrested for a far more serious crime committed in another jurisdiction.[23] Defendant was informed of the crime immediately and that he was to be extradited to Ohio to face

**23.** The officers acknowledged they had no probable cause to search for drugs. While the anonymous calls and defendant's past record suggested that activity, the only police contact with him, the December 23 search, had produced nothing.

the murder charge.[24] In these circumstances an arresting officer's concern for the prompt and orderly disposition of a defendant's personal effects would appear to be entirely in order. Considerations of efficiency and economy plainly pointed toward taking care of the matter on the spot if it were possible to do so, and I can see nothing inherently sinister or coercive in merely asking the defendant what he preferred. That was all that Det. Pharo did. Secondly, since, as I have found in Part I, the officers had probable cause to obtain a search warrant for the murder weapon, they had no motive to force an immediate search of the room.

Defendant's response was to have someone else come and pick up his things. Det. Pharo scotched that idea; he said that only the police or the management of the motel would have access to the room. The question for decision is whether Det. Pharo spoke falsely and deliberately to mislead defendant as to a material matter. If he did, and if the misconduct induced defendant's assent, then the fruits of the entry must be suppressed, as subtle devices—improper interrogation tactics, trickery and deceit—are as much condemned as the direct forms of coercion. *Colorado v. Connelly*, 479 U.S. at 170, 107 S.Ct. at 523.

I find, however, that Det. Pharo did not engage in any misconduct. Whatever the policy or practice of the motel management may have been in this regard (no one asked Mr. Shapiro when he testified) I have already concluded in Part I that the authorities would have sought a search warrant for the murder weapon but for the course of events which actually transpired. Whether or not the warrant issued, it may be taken as established that it was within the authority of the police to seal the room while the warrant was being obtained. *Segura v. United States*, 468 U.S. 796, 798, 104 S.Ct. 3380, 3382, 82 L.Ed.2d 599 (1984). Thus, Det. Pharo's statement that no one else would be allowed to enter the room

and remove the contents was a truthful one, even if the application were denied. Since it was growing late, the success of the application might not be known for some time.[25]

Det. Pharo's representation regarding the practices of management with regard to third party entry may or may not have been accurate, but that is irrelevant. His message to defendant was that an attempt by a third party to pick up his things would be resisted and that was true. Beyond that, experience teaches that it is unlikely that an innkeeper will allow a third party to enter and remove property from a guest's room. As the management was well aware, defendant's occupancy came to an end with his arrest and it is not improbable that the motel would have collected and stored defendant's goods at the first opportunity. In any event, defendant refused to accept the validity of Det. Pharo's explanation in this regard, so he can hardly claim to have been misled by it.

This does not conclude the matter, however, as the circumstances surrounding the arrest and entry reveal the presence of a number of facts which courts have deemed important in determining whether a consent was fully and voluntarily given. These factors were enumerated by Chief Judge Bauer in *United States v. Rojas*, 783 F.2d at 109. In addition to those mentioned above, they include: the age, education and apparent intelligence of the subject; whether, and how long, the subject was in custody when consent was obtained; whether defendant was in restraints; the repeated and prolonged nature of the request for consent, the use of physical coercion such as deprivation of food or sleep; and whether the subject was informed of his or her constitutional rights. Other factors are whether the arrest occurred late at night, was made with display of weapons, or by forcible entry; whether, in a search incident to arrest, the police gained custody of the key to the place to be

---

**24.** According to Det. Pharo, communication between the local and Columbus officers responsible for extradition was actually initiated within a short time after defendant's arrest.

**25.** It was never suggested that defendant would be permanently deprived of his property. The question how it would ultimately be returned to him did not arise.

searched; whether promise of release from custody was used as leverage to obtain consent; and whether the subject could be expected to be in a vulnerable subjective state.. To these may be added the use by police· of moral or psychological pressures and outright intimidation or threats. *Connelly*, 479 U.S. at 170, 107 S.Ct. at 523.

Analysis of the facts in light of these factors produces mixed results. While it was not too late at night (defendant was planning to go out), he was arrested in a strong display of weapons, manpower and physical force. He was immediately placed and kept in handcuffs and under close physical supervision. While the arrest was not made by forcible entry, the room key was taken from him and the officers made an illegal entry and "sweep" of the motel room. The conversation about defendant's clothes followed immediately without any advice of rights. As noted, it was not so much a request for consent as for instructions; there were no repeated or prolonged supplications and no promises, threats, or physical coercion. The lapse of time from arrest to defendant's assent to the removal of the goods was very short—less than 5 minutes.

I do not believe that any of these considerations caused, or even influenced, defendant's decision to permit the removal of his property from the room. The show of weapons and physical force in connection with his arrest, and the employment of restraints, were all appropriate to the offense with which he was charged and it has not been suggested that those actions were designed to intimidate him into consenting. *Rojas*, 783 F.2d at 109–110. To be sure, the unauthorized entry and sweep of his room was unlawful and it had an undeniably coercive quality about it. But that exhibition was not directed at defendant and it was over by the time defendant assented to the entry. The officers had satisfied themselves that there was no external threat to their security and they had holstered their weapons and were standing around the doorway awaiting instructions.

The ultimate question is whether the decision was defendant's "essentially free and unconstrained choice" or whether "his will has been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2047. From my observation of defendant, and from his own and the other testimony, I gain the impression of an intelligent, experienced and extremely self-assured person. Though only twenty years old, he is wise in the ways of the world and the criminal justice system. He was decidedly not one in a "vulnerable subjective state." He had been arrested several times, convicted of serious drug offenses, and was facing even more serious charges. He had successfully distanced himself from the unpleasantness in Columbus and quickly reestablished himself with a new identity in Madison. He was familiar with the ways of the police.[26]

The arrest itself came as no surprise to him. According to his testimony, he knew he was wanted on a parole violation warrant out of New York and assumed that was the reason for the police interest in him. He assumed the police would come to the motel because they were following him. When the manager called and asked him to come down to the office he expected the police to be out there. In spite of the show of force and firepower, defendant did not appear intimidated. He continued to maintain his false identity and argued with Det. Pharo's statement that the motel management wouldn't let anyone else in the room.

While I have no doubt that this episode could have been better handled, I am satisfied that defendant's will was not overborne and his capacity for self-determination was not impaired by anything the officers said or did or omitted. Defendant was offered a clear and fairly-stated proposal and he admits he understood what Pharo said. He was at complete liberty to accept

---

**26.** For example, he had no trouble picking up Det. Grann's vehicular surveillance because he said the officer made several mistakes in following him. A measure of his bravado is seen in his remark to Det. Grann on the way to jail that Grann should not make a career move into surveillance. (Tr: 80; Dkt. #26)

or reject it. He knew his choices and he was sufficiently sophisticated to weigh them. He did not yield to any coercion, subtle or overt, nor submit to any claim of authority. It happens that his decision, like those of the defendant in *Rojas* and most other consent cases, turned out to be the wrong one, but an error in judgment does not render one's otherwise valid consent involuntary.

I conclude that defendant freely and voluntarily assented to the officer's removal of his clothing and effects from his room and that this motion to suppress should be denied on this ground as well.

### RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED, pursuant to 28 USC § 636(b)(1)(B), that defendant's motion to suppress be DENIED.

ENTERED this 19th day of September, 1989.