**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**David REM, Defendant–Appellant.**

**No. 92–1672.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 17, 1992.

Decided Jan. 26, 1993.

Bradley W. Murphy, Asst. U.S. Atty., John H. Campbell (argued), Office of the U.S. Atty., Peoria, IL, for plaintiff-appellee.

Kevin E. Milner, Allan A. Ackerman (argued), Chicago, IL, Richard H. Parsons, Peoria, IL, for defendant-appellant.

Before POSNER, COFFEY and MANION, Circuit Judges.

MANION, Circuit Judge.

David Rem boarded a train in Los Angeles destined for Chicago. He departed the train during a stop outside Chicago, but left his suitcase containing 18 kilograms of cocaine on the train. After all passengers deboarded in Chicago, the police obtained the suitcase and opened it without a search warrant. Rem pleaded guilty to possession of a controlled substance with intent to distribute but reserved the right to appeal the district court's denial of Rem's motion to suppress. The district court found that the suitcase was abandoned, leaving Rem with no expectation of privacy. We affirm the district court.

## I.

At the hearing before the district court on David Rem's motion to suppress, Thomas P. Kinsella, a Chicago police officer assigned to the Drug Enforcement Administration (DEA) Task Force, testified that on May 28, 1991, at approximately noon, he received a telephone call from the police in Kansas City, Missouri, regarding a suspicious person on the Amtrak train which runs from Los Angeles to Chicago. The Kansas City police told Kinsella that they had arrested two people on the train's sleeper car 0430 in an unrelated drug investigation. They had learned from train employees that another passenger on sleeper car 0430, traveling under the name of David Reilly, bought his ticket in Los Angeles with a large amount of cash; kept his suitcase with him in his compartment; stayed in the sleeper car, having meals brought to him; and would not allow the car attendant to come in and make his bed.

Kinsella spoke with Amtrak personnel and discovered that "Reilly" had boarded the train in Los Angeles, a source city for narcotics, and was ticketed through to Chicago. He paid over $700 in cash for the ticket; purchased the ticket on the day the train was to leave Los Angeles; and left a call-back telephone number which was actually a disconnected number. The information suggested to Kinsella that Reilly might be a narcotics courier.

At about 4:00 that afternoon Kinsella and Agent Michael Bobko and an Amtrak police officer, Dennis Kroll, met the train when it arrived. They spoke with several cars attendants, who reported that Reilly had "jumped off the train" in Chillicothe, Illinois, carrying only a backpack. Kinsella testified on cross-examination:

> The train had stopped. The car attendant—one of the car attendants was assisting an elderly woman, who was the only passenger who was scheduled to get off in Chillicothe, was assisting her off the train and Mr. Rem pushed by her and pushed by the elderly woman and jumped off the train.... She described it as almost running away from the train.

Kinsella also testified, in answer to the court's questions, that one car attendant expressly stated that defendant "jumped." He explained further:

> [S]he said that he ... jumped over the stairs and began running in the direction away from the train. She said that she started to say something to him. She said 'sir' in a loud voice, and he just continued running and she didn't say anything after that.

One of the train's car attendants at Union Station then told Kinsella that "Reilly" had "left his suitcase on the luggage rack

right inside of the train." All of the sleeper car attendants stated that they had not moved the suitcase. After all passengers deboarded the train, Kinsella was given the suitcase:

> Shirlene Mitchell, the crew chief for sleeper car attendants, stepped inside of the train and I followed her in and she pointed to a gray Samsonite oyster suitcase on the luggage rack and stated that was the passenger David Reilly's suitcase. It was the only piece of luggage left on the sleeper car.

The suitcase had no identification or tags on it. Kinsella testified that the Samsonite suitcase was often used for carrying drugs because of its hard sides and rubber gasket seal. The crew chief asked Kinsella to lift the suitcase from the luggage rack because she could not reach it. Kinsella then "removed the bag from the top shelf of the luggage rack."

Kinsella explained that a sleeper car contains a number of small compartments and several deluxe bedroom compartments. Defendant was in deluxe bedroom "B" from Los Angeles to Albuquerque; he then transferred to a smaller sleeper compartment number 9. The smaller compartment is located along the hallway of the second floor. The luggage rack where Kinsella found defendant's suitcase is located on the lower level adjacent to the exit door of the sleeper car, directly next to the exit door of the sleeper car. It is an open rack. It is available for use by the whole train car. (Officer Bobko described the train car similarly). Kinsella took the suitcase outside onto the platform. The crew chief said she would turn the bag over to Kroll [the Amtrak officer] "because of the circumstances that had previously occurred." As Kroll watched, Kinsella used a pocket knife to pop open the suitcase. (There were two locks on the side of the suitcase which were not locked, and a plastic combination lock over the center of the suitcase which was locked.) The suitcase contained 18 brick-shaped packages of cocaine. They carried the suitcase to Kinsella's office in the train station.

Ten minutes after Kinsella brought the suitcase to his office, several Amtrak employees came in to report that they had just seen "Reilly," although his clothing was different. Kinsella and Bobko left the office and entered the station's lobby area, where they saw Rem talking on a pay telephone; he "appeared very excited," waving his hand in the air. Kinsella and Bobko approached Rem and asked if they could speak with him. Rem nervously attempted to hang up the telephone. When asked, Rem, his hands shaking, produced a New York driver's license in the name of David Rem.

Kinsella testified further that Rem denied being aboard the train from Los Angeles at any time; in fact, he denied being aboard any train at all. He stated that he was "just looking around" the train station. He had been in Chicago for two weeks and was staying at a motel, although he could not remember the name or location of the motel. Several car attendants and crew chief identified Rem as the individual traveling under the name of David Reilly. Rem was then placed under arrest.

On cross-examination, Kinsella stated that one Chicago police department summary report stated the luggage was found in the "sleeper car"; another summary report stated it was found in the "train compartment"; and the criminal complaint referred to locating the suitcase in the "sleeping car." Kinsella testified further that he kept a trained dog accessible, but he did not believe it was necessary to use the dog once it was determined that the luggage had been abandoned.[1]

Kinsella's subsequent interviews of witnesses in Chillicothe revealed that Rem exited the train, entered the train station, and asked the ticket agent about transportation to Chicago, possibly "at the time the train

---

1. Kinsella testified that routinely, a drug-sniffing dog was not used for abandoned property. Instead, the "only reason that we have the dog is if we have enough facts to detain an individual's luggage and he does not give us consent to search the luggage and if we have enough reasonable suspicion to detain the luggage, we have the dog examine it at that time." Moreover, it was his practice to bring the suitcase to the dog, who was kept about one block from the station.

was in the station." Rem said nothing to the ticket agent about missing the train, and nothing about his suitcase. He then went to a local restaurant and asked about transportation to Chicago, explaining only that he had to "meet someone." He did not mention the suitcase. Rem telephoned a local taxi dispatcher, who asked him whether he had missed his train, and he replied, "Yes." He then took a cab to the Peoria airport, and bought a plane ticket at 2:40 p.m. to Chicago. In Chicago, Rem checked into a motel at 4:05 p.m.

Officer Michael Bobko testified similarly, adding that when he and Kinsella met the train at 4:00 p.m., he watched as Kinsella stepped out of his view for only "a few seconds, long enough to go up the stairs, go out of my sight and come right back into my view with the suitcase."

Bobko later interviewed Jack Broyles, an attendant on car 0430. Broyles spoke with Rem several times after the Kansas City stop and before the Chillicothe stop.

> Broyles stated that Rem has asked him about the incident in Kansas City where two men had been arrested by Kansas City police officers and Broyles related to me that he informed Rem that there had been an arrest for narcotics involving the Kansas City police and Broyles stated that he told Rem he didn't know too much more about it.

The district court denied Rem's motion to suppress. Subsequently, in response to Rem's motion for reconsideration, the district court permitted him to appear on November 15, 1991 and testify regarding the motion to suppress.

Rem testified that on May 26, 1991 he traveled to Los Angeles for the purpose of acting as a drug courier. On that day, he was given the drugs and cash by his "contact," Hector. Rem testified that he was in car number 0431, not 0430; that he did not remain in his private compartment or ask the staff to bring him meals; that he knew nothing about the arrests in Kansas City because he slept late that morning; and that he never put his suitcase in the public luggage rack.

Rem testified further that in Chillicothe, he deboarded without hurrying and without seeing any other passengers deboard. Within three minutes, he realized that the train had left, although he stood at the telephone which was 40 feet from the tracks, with an unobstructed view. After flying in to Chicago, Rem took a taxi to a motel in order to change his clothes, to telephone a friend in New York whose mother was going to be having surgery, and to provide himself with a safe place to return with the suitcase.

Rem went to Union Station at about 4:25 p.m., walking directly to the train, where several Amtrak employees near the train told him that the police had broken into his suitcase. He went to a pay telephone in the station, called Amtrak and explained, "I'm in Chicago and this worker just told me about the police breaking into my bag. Why was this done? How can I get my bag?" Rem continued: "And at that point ... in my trip I had no intention of leaving that station or my bag because I'm in big trouble without my bag." In response to the court's questions, Rem stated: "At that point I even knew I would be arrested, but I would prefer to be arrested than to try to show up and explain with no concrete proof of where the drugs were because the people might think that I just—that I'm lying and I took off with their drugs." Rem also told the court: "I was only temporarily and I think very momentarily separated from my luggage."

## II.

### A. Standard of Review

■ A reviewing court will not disturb the trial court's decision on a motion to suppress evidence absent clear error. *United States v. Gillespie,* 974 F.2d 796 (7th Cir.1992); *United States v. Spears,* 965 F.2d 262 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). A decision is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *United*

*States v. D'Antoni,* 856 F.2d 975, 978 (7th Cir.1988). Thus, the district court's factual findings regarding abandonment will be reversed only if clearly erroneous. *United States v. Nordling,* 804 F.2d 1466, 1469 (9th Cir.1986); *United States v. Binder,* 794 F.2d 1195, 1198 (7th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 234, 93 L.Ed.2d 159 (1986).

### B. The Law of Abandonment

■■■ The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amdmt. IV. A person may possess a privacy interest in the contents of personal luggage. *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). However, that privacy interest can be forfeited where the person abandons the luggage. *United States v. Rush,* 890 F.2d 45, 48 (7th Cir. 1989). Fourth Amendment protection does not extend to abandoned property. *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960).

This case involves a question of pre-search abandonment. We are not presented with a question of whether a reasonable suspicion or probable cause justified Kinsella's search of Rem's suitcase. If Rem indeed abandoned the suitcase before the police searched it, the Fourth Amendment inquiry ends.

A test has been articulated for determining whether an abandonment has occurred for purposes of Fourth Amendment analysis:

> The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. This determination is to be made by objective standards. An expectation of privacy is a question of intent which "may be inferred from words spoken, acts done, and other objective facts."

*United States v. Jones,* 707 F.2d 1169, 1172 (10th Cir.), *cert. denied,* 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983) (quoting *United States v. Kendall,* 655 F.2d 199, 201 (9th Cir.1981), *cert. denied,* 455 U.S.

941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1982)); *see also United States v. Hedrick,* 922 F.2d 396, 397 (7th Cir.) (abandonment depends on whether expectation of privacy in object is "objectively reasonable"), *cert. denied,* —— U.S. ——, 112 S.Ct. 147, 116 L.Ed.2d 113 (1991); *United States v. Akin,* 562 F.2d 459, 464 (7th Cir.1977), *cert. denied,* 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978). "When a person voluntarily abandons property ... he forfeits any reasonable expectation of privacy that he might have had in the property." *United States v. Lee,* 916 F.2d 814, 818 (2d Cir.1990).

■■■ Initially we must address Rem's attempt to steer the court's abandonment inquiry away from the objective information available to the police. A Fourth Amendment inquiry turns on the perspective from which we view the physical separation of defendant and his suitcase. As one court stated:

> The primary question on appeal is whether abandonment is to be determined by reference to [defendant's] subjective intent or by reference to the objective manifestation of an individual's intent, i.e., whether a subjective or an objective test applies.

*Kendall,* 655 F.2d at 200.

Rem urges this court to focus on his own subjective desire to regain possession of the suitcase as proof of his expectation of privacy. This obviously will not work. His subjective "intent" could be any hindsight excuse that fits the situation. We must instead examine the objective facts as the various agents encountered them.

This court has stated that an individual cannot avoid a finding of abandonment by offering nothing more than a "self-serving, non-factual declaration that he expected privacy." *Wilson v. Health & Hosp. Corp.,* 620 F.2d 1201, 1213 (7th Cir.1980); *see also Rush,* 890 F.2d at 48 (court may look "beyond his disavowal [of ownership] and examine the surrounding circumstances" using a "totality of circumstances" test, and focusing on whether or not the police officers "were justified in concluding that Mr. Rush had no expecta-

tion of privacy with respect to the bag....").[2] 1 Wayne R. LaFave, *Search and Seizure* § 2.6(b) at 465 & § 2.1(c) at 309 (2d ed. 1987).

■ This court must ask, then, whether Rem relinquished the suitcase under circumstances which indicated to the police that he had no justified expectation of privacy in the contents of that suitcase. In order to determine whether a pre-search abandonment has occurred, the flow of information considered stops at the moment the police officer opened the suitcase. The objective facts known to the police standing on the train platform in Union Station with the suitcase determine whether Rem could reasonably have any continued expectation of privacy in the suitcase.

## C. Information Known to the Police at the Time of the Search

Rem asserts that he doggedly chased after the runaway suitcase, making "every human effort to return to the Amtrak train [in Chicago]." Failure to retrieve a checked suitcase from a baggage claims area does not automatically constitute abandonment. "An individual may depart from an airport without claiming her luggage for a variety of reasons, with full and legitimate intent to return and claim the baggage." *United States v. Tolbert,* 692 F.2d 1041, 1044 (6th Cir.1982), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983). But the police were not merely confronted with a train passenger who failed to claim his luggage from the Amtrak train when it arrived in Chicago.

■ Instead, the facts here differ considerably from cases where an airline or train passenger failed to promptly retrieve checked luggage from the claim baggage area at the airport or train station. *See, e.g., Lee,* 916 F.2d at 818 (failure to promptly claim luggage *checked* with an airline does not necessarily constitute an abandon-

ment) (citing *United States v. Oswald,* 783 F.2d 663, 667 (6th Cir.1986); *United States v. Sanders,* 719 F.2d 882, 885–86 (6th Cir. 1983)). Rem never checked his bag with Amtrak. Instead, he chose to place the suitcase, which had no identification on it, in a public luggage rack on the train, and then abruptly left the train without it before reaching his destination. Rem's failure to pick up the luggage along with several other factors indicated that he had abandoned the luggage and retained no legitimate expectation of a privacy interest in it. *See Nordling,* 804 F.2d at 1469 (court must consider the totality of the circumstances to determine whether a person's words and acts indicate he has relinquished a reasonable expectation of privacy in the property).

The police were aware that the suitcase was found on a luggage rack accessible to anyone on the train. While Rem argues that he left his suitcase in his private compartment, that was a credibility question for the district court to resolve. The district court found that he left the suitcase in the rack, not in the private compartment. This finding is supported by the evidence. Kinsella testified that the suitcase was found on the luggage rack located next to the exit on the first level of the car. Bobko supported this, testifying that Kinsella and the crew chief stepped out of Bobko's view for only "a few seconds," and then immediately returned with the suitcase.

Rem cites the police reports in support of his testimony. However, the reports do not contradict the district court's findings. One police summary report states the suitcase was found in the "sleeper car"; another police summary report points to the "train compartment"; and the criminal complaint refers to the "sleeping car." The district court correctly noted that none of the reports expressly indicated that the

---

**2.** Other circuits similarly focus on objective manifestations of defendant's intent. *See, e.g., United States v. Hawkins,* 681 F.2d 1343, 1345 (11th Cir.), *cert. denied,* 459 U.S. 994, 103 S.Ct. 354, 74 L.Ed.2d 391 (1982); *United States v. Kendall,* 655 F.2d 199, 200–01 (9th Cir.1981), *cert. denied,* 455 U.S. 941, 102 S.Ct. 1434, 71

L.Ed.2d 652 (1982); *United States v. Brown,* 663 F.2d 229, 231 n. 49 (D.C.Cir.1981); *United States v. Taborda,* 635 F.2d 131 (2d Cir.1980); *United States v. Williams,* 569 F.2d 823, 826 (5th Cir. 1978); *United States v. Colbert,* 474 F.2d 174 (5th Cir.1973).

suitcase came from the upstairs private compartment number nine. Moreover, there was no clear error in the court's finding that Rem would have been more likely to leave it on the downstairs public rack in order to "draw attention away from himself."

Furthermore, it is generally recognized that the privacy interest of people who are in transit on "public thoroughfares are substantially less than those that attach to fixed dwellings." *United States v. Whitehead,* 849 F.2d 849, 854 (4th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988) (citing *inter alia, United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)); *see also United States v. Colyer,* 878 F.2d 469, 476 (D.C.Cir.1989). The luggage rack was available to all passengers, located right next to an exit door. Even if the suitcase had been found in the private sleeper compartment, it would hardly be justified for Rem to expect to retain a heightened privacy interest in it.[3] After all, he had mysteriously left the train at a stop many miles before his scheduled destination. And when they removed his suitcase, all passengers and all other luggage were gone.

Rem also argues that he only stepped away from the train for a few moments to telephone Hector. The trial court found this testimony to be incredible. The district court believed that Rem was nervous about the Kansas City drug-related arrests made in his car on the train, deboarded at Chillicothe in order to distance himself from the cocaine-laden suitcase, and later thought better of the idea, fearful of Hector the supplier's response to news of the intentionally abandoned crack cocaine.

The district court did not err in finding that Rem may have initially believed that prudence dictated he leave the train and the suitcase, approach Chicago by another route, and scrutinize Union Station for authorities who might be paying special attention to the drug-laden suitcase. It is irrelevant that Rem might have made an unwise tactical decision in Chillicothe, based on his fear that the police might have legal grounds for searching the suitcase or for arresting him in Chicago.[4]

The significant piece of information which the police relied upon in deciding the suitcase had been abandoned is the report that Rem had "jumped off" the train prior to its reaching Chicago. The police knew that Chillicothe was not an announced passenger break for the train; that Rem was not scheduled to deboard at that stop; and that he left the train hurriedly, almost knocking over another passenger. Moreover, the trial court did not believe Rem's testimony that he did not hear the train leave, since Rem had an unobstructed view of the tracks, only 40 feet from the telephone. The district court found: "I also

---

3. *See, e.g., United States v. Colyer,* 878 F.2d 469, 475–76 (D.C.Cir.1989) (court rejects defendant's argument that his Amtrak roomette is like a hotel room or apartment, finding that "[w]hile an Amtrak sleeper car may in some ways resemble a residence, it enjoys no such status in law"); *United States v. Whitehead,* 849 F.2d 849, 854 (4th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988) (suspect could get off train at any stop); *United States v. Tartaglia,* 864 F.2d 837, 841 (D.C.Cir.1989) (no heightened expectation of privacy in train roomette; automobile exception applied); *United States v. Johnston,* 497 F.2d 397, 398–99 (9th Cir.1974) (upholding warrantless search of suitcase on Amtrak train; agent "was not required to assume that Defendant would stay on the train with the marijuana in the suitcases all the way to New York City," since he could "depart with the suitcases at some stop along the way," or even hand them over "at some intermediate point to an accomplice"); *United States v. Dimick,* 790 F.Supp. 1543, 1549 (D.Colo.1992) (sleeping compartment on train differs from hotel room); *United States v. Liberto,* 660 F.Supp. 889, 892 (D.D.C.1987) (upholding warrantless search of train passenger's suitcase; if authorities wired ahead to another jurisdiction to obtain a warrant there, they risk a situation where "defendant might well have left the train at an earlier stop"), *aff'd without opinion,* 838 F.2d 571 (D.C.Cir.1988).

4. *See also* 1 Wayne R. LaFave, *Search and Seizure* § 2.6(b) at 474 (2d ed. 1987), explaining: "Surely the Fourth Amendment does not protect people from decisions which, in retrospect, appear unwise, and thus the mere fact that B (correctly or incorrectly) thought he was going to be searched and consequently attempted to get rid of the incriminating evidence is not enough to negate his abandonment."

have a lot of trouble believ[ing] that any train ... that size could leave without making any noise or substantial noise...."

In addition, the police were aware that prior to leaving the train, Rem had acted peculiarly, raising the suspicions of the train crew. He had also showed unusual concern about the Kansas City arrests. Other facts known about Rem's trip, such as his paying over $700 cash for the ticket just before departure and giving a wrong telephone number, fit the profile of a drug courier. Moreover, Rem took one of his bags when he "jumped off" the train, yet left the bag which held the cocaine in a common area with no identification attached.

Thus, the circumstances known to Kinsella at the time of the search supported a conclusion that the suitcase had been abandoned.

### D. Reassertion of Privacy Interest

■ Rem points repeatedly to the moment in Chillicothe when perhaps a change of heart prompted him to travel to Chicago and find his suitcase. His purported intention to later retrieve the object is irrelevant. In *United States v. Williams*, 569 F.2d 823 (5th Cir.1978), the court found that an unhitched trailer which defendant had left parked in a rest stop area when he realized he was being followed, had been abandoned:

> [Defendant] knew he was followed by government officers. His only conceivable purpose in leaving the trailer unguarded and unlocked in the parking area was to rid himself of the vehicle with its incriminating contents [marijuana]. Perhaps he retained a hope that he might accomplish two objects: the pro-

tection of himself from possession of evidence while he was pursued, and the chance of recovery of the trailer if neither the officers nor anyone else took it.... Williams was just like the bank robber who having a gun, finds himself pursued, and in his hope of escaping detection throws the gun into a yard—where, if it is not picked up he might retrieve it. Such conduct is transparently an abandonment of the tight grip of ownership and reliance solely on the feeble hope of re-acquisition.

*Id.* at 826.

Similarly, in *United States v. Oswald*, 783 F.2d 663, 668 (6th Cir.1986), the court found abandonment where the defendant left a burned-out car on the freeway, with a metal suitcase in the trunk. The court held that "it makes no difference that defendant may have entertained hope of regaining possession at some future time." The court explained: If, under an objective standard, defendant abandoned the metal briefcase, "we fail to see how [his] subsequent conduct ... could possibly have revoked the abandonment *nunc pro tunc*, even if [the police officer who searched the suitcase] had known of such conduct...." *Id.* at 668.[5]

Rem argues that he fully intended to claim ownership of the suitcase, even after the police broke into it and found cocaine. The trial court discounted this testimony: "I also find it very incredible if he was informed that the police had broken into the bag, had seized the bag and broken into it, that it was still his intention at that time to assert ownership of the bag. That's absolutely ridiculous and I don't believe it." We cannot say that this finding is clearly erroneous.

---

5. Other circuits hold similarly in regard to subjective intent to return to retrieve an object. *See, e.g., United States v. Lewis*, 921 F.2d 1294, 1302 (D.C.Cir.1990) (it is "irrelevant" that bus passenger "might have repossessed" her tote bag which the police officer took from rack above seats after all passengers denied ownership); *United States v. Thomas*, 864 F.2d 843, 846 n. 5 (D.C.Cir.1989) (legal significance of defendant's conduct "is not altered by the fact that he might have intended to retrieve the bag later"); *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.)

(defendant's "hope[] that the police would not find [satchel] and that he could later retrieve it" is not determinative), *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983); *Kendall*, 655 F.2d at 202 (once suitcase is abandoned, later assertion that defendant fully intended to retrieve it has no effect); *Smith v. United States*, 292 A.2d 150, 151 (D.C.1972) (it is "irrelevant" that defendant "intended eventually to return and retrieve" pistol he discarded during police chase).

The record supports the district court's finding that Rem did not actually intend to rush to the incoming Chicago train to quickly regain possession of the suitcase before the police found it. Notably, Rem arrived in Chicago and went to a motel to change his clothes and make several telephone calls. The district court stated: "I'm very puzzled in view of his explanation of what happened here that if he was concerned, as I believe he certainly would have reason to be concerned, about his safety that he would have stopped on the way from Midway airport to the Amtrak station and taken the time to check into a motel based on his explanation. I find that incredible."

In addition, when the police approached him, Rem *denied* having been on the train from Los Angeles—or on any train at all. He had been in Chicago two weeks; could not remember the name or location of his hotel; and was merely "visiting" and "looking around" at the train station. This is the equivalent to an oral disclaimer of ownership. *See Tolbert*, 692 F.2d at 1044–45 (court found the oral disclaimer showed abandonment). Aside from any issue of standing, at the very least, Rem's statements indicated that he had no expectation of privacy in the suitcase which did not have his name on it, and which was found on a train that defendant had never been aboard.

### III.

The district court did not err in finding that Rem had abandoned the suitcase and as a result had no legitimate expectation of privacy in it or its contents. The district court's denial of Rem's motion to suppress the evidence found is

AFFIRMED.