**UNITED STATES of America, Plaintiff,**

v.

**Tyrond BROWN, Defendant.**

**No. 93–CR–204.**

United States District Court,
E.D. Wisconsin.

Sept. 7, 1994.

Steven M. Biskupic, Asst. U.S. Atty., Milwaukee, WI, for plaintiff.

Martin E. Kohler, Kohler & Hart, Milwaukee, WI, for defendant.

## ORDER

RANDA, District Judge.

This matter comes before the Court on defendant Tyrond Brown's ("Brown") motion to suppress evidence seized from an apartment located at 9010 N. 97th Street in Brown Deer, Wisconsin. On January 12, 1994, the motion was heard before Magistrate Judge Aaron E. Goodstein. On March 15, 1994, pursuant to Local Rule 13.03(a), the Magistrate recommended to this Court that the motion be granted and the evidence suppressed. On May 18, 1994, pursuant to Local Rule 13.03(c), this Court directed the parties to submit supplemental briefs on the issue of whether Brown's disclaimer of an interest in the apartment precludes a subsequent Fourth Amendment challenge to the warrantless search. For the reasons set forth below, Brown's motion to suppress is denied.

## FACTUAL BACKGROUND

On November 18, 1993, at approximately 4:30 p.m., Drug Enforcement Administration Special Agent Raymond Melick ("Melick") was at a McDonald's restaurant awaiting a controlled purchase of crack cocaine from an individual named Chris Johnson ("Johnson"). After his arrest, Johnson and his car were searched. Found on Johnson's person was an ounce of crack cocaine, a loaded pistol, other powder cocaine and marijuana. In the glove box of the car, Melick found a car rental agreement for an individual named Fannie Bonds, residing at 9010 N. 97th Street, Apartment 203. While the rental agreement was not for the car Johnson was driving, a registration check revealed that one Fannie Bonds was the owner. Johnson told Melick that he had borrowed the car from a friend, and that he did not know Fannie Bonds. Johnson then told Melick that the person who was to receive the proceeds of the cocaine sale lived near 95th and Brown Deer. Johnson agreed to cooperate with Melick. At that point, Johnson's mobile phone began to ring. Johnson answered the phone, spoke to a person named "Ty," told him everything was fine, and indicated that he would call Ty back. Johnson then informed Melick that Ty was the person who was to receive payment for the crack. Johnson described Ty as a black male around 22 years of age.

Johnson and Melick proceeded to Johnson's apartment where Johnson phoned Ty and arranged to meet Ty outside the latter's residence to deliver the money from the sale.

Johnson, Melick and other officers proceeded to the vicinity of 9010 N. 97th Street As they approached the area, Melick saw a black male standing "outside of or near" 9010 North 97th Street (Transcript at 13). Losing his cooperative spirit, Johnson declined to affirmatively identify the individual as Ty. Melick testified that he exited the car, approached the individual, identified himself as a police officer, and:

> asked him some general questions and asked him if I could have his telephone, he gave me the telephone and then I asked him if I could push the redial on the telephone, he stated I could. When I pushed the redial on the telephone, Chris Johnson's telephone rang.

Transcript at 14.

After concluding that this was the person to whom Johnson had previously communicated, Melick placed Brown under arrest, searched him, and discovered a key chain. (Transcript at 15).

The substance of the verbal exchange which transpired during this initial encounter between Melick and Brown is both contested and pivotal to the motion to suppress. Brown contends that he first told Melick that he was waiting for a ride. With respect to where he lived, Brown contends that he told Melick that he stayed with his sister, then he refused to say where he lived, and finally, that he stayed with his mother, Fannie Bonds, in Apartment 203, at 9010 N. 97th Street. Melick's recollection is notably different. Melick testified that Brown told him he was locked out of his apartment and that when asked where he lived, Brown, who could have "very easily" pointed to 9010 N. 97th Street, the building in front of him (Transcript at 12–18), pointed away from the direction of 9010 N. 97th Street.[1] Melick then testified that when Brown was asked if he knew Fannie Bonds, he refused to answer more questions.[2] Special Agent James Craig's ("Craig") recollection is consistent with Melick's. Craig testified that as he approached Melick and Brown, he heard Brown say that he was waiting for a ride and "[t]hat he didn't live here." (Transcript at 58).

After the arrest and search, Craig placed Brown in his car, Melick, Unger, and Saari proceeded into the apartment building.[3] After examining the mailboxes, they noted that a Fannie Bonds was listed as residing in Apartment 203. After going up to Apartment 203, they knocked, and after receiving no answer, tried the keys that had been taken from Brown.[4] One of the keys opened the door, and the law enforcement officers entered the apartment to do a "quick check" (Transcript at 51). According to Melick, they were not searching for drug evidence, but instead for "foul play or something amiss in there basically with this Fannie Bonds." (Transcript at 21). Craig later joined the other agents in the apartment. (Transcript at 51). While moving through the apartment, Melick noticed a cellophane bag on the night stand in one of the bedrooms containing what appeared to be cocaine. (Transcript at 21–22). During the check, Craig saw a picture of Brown and another individual on a dresser in a bedroom. (Transcript at 51 & 52). He removed the picture and took it to show to neighbors to "find out if Mr. Brown actually lived there." (*Id.*) When asked, two neighbors indicated that Brown lived in Apartment 203 with his mother. (*Id.*) At some point, an agent returned to the car where Brown was seated and showed

---

1. More specifically, the transcript reveals that Melick and Brown were standing on a walkway between two buildings and 9010 was the building directly north of them. Further, during cross-examination, Melick indicated that Brown, when asked where he lived, pointed in a northeasterly direction rather than "just point[ing] to the building in front of him[.]" (Transcript at 17–18).

2. The transcript reveals that Melick posed these questions to Brown prior to putting him under arrest. "I asked him previous to putting under arrest where, I believe where he lived." (Transcript at 15).

3. Melick testified that the other officer was Chuck Unger of the West Allis Police Department.

4. Craig testified that he arrived at the apartment towards the end of the search. (Transcript at 51). From Craig's testimony it appears that Melick, Unger, and Neil Saari were the first to enter the apartment. (*Id.*)

the photograph to him.[5] Melick left to apply for a warrant leaving Craig and Unger to secure the premises. (Transcript at 52). Agents Saari and Parker then transported Brown to the Waukesha County Jail. (*Id.*) While Craig sat outside the apartment door, a woman identifying herself as Fannie Bonds arrived. Craig explained to her what was happening. When she stated that she wanted to enter the apartment, Craig told her that he would have to accompany her. (Transcript at 53). Once inside, Craig showed Bonds the drugs and she became visibly upset. He also testified that while they were talking, Bonds consented to a search of the apartment. Bonds denies that she consented. In any event, no search was made. (Transcript 55). Craig did not perform a search because Melick "thought it was prudent to wait because it would alleviate any concern whether Bonds' consent was effective for Brown's bedroom and because a warrant was a more certain mechanism for obtaining authorization to conduct a search." (Recommendation at 6). Craig testified that no drug search was conducted before the warrant was received. (Transcript at 56). The search incident to the warrant recovered thirty (30) grams of crack cocaine. Subsequently, Brown was charged in a one-count indictment for violations of 21 U.S.C. § 841 and 18 U.S.C. § 2.

## PROCEDURAL BACKGROUND

On January 5, 1994, Brown filed the instant motion pursuant to Fed.R.Crim.P. 12(b) arguing that the initial warrantless entry was in violation of the Fourth Amendment. The government identified the following issues for the hearing: (1) "According to the facts on the record, Brown has denied any connection to Apartment 203 at 9010 N. 97th Street On what basis does he now claim standing to challenge a search of the premises."; (2) whether Agent Melick's warrantless search was justified by exigent circumstances for the well-being of Fannie Bonds; and (3) whether Fannie Bonds' gave consent to search to Agent Craig. At the commencement of the motion hearing, Magistrate

Goodstein indicated that "the government raises a question of whether or not Mr. Brown has any standing to challenge the search of the premises...." (Transcript at 2). At the conclusion of the examination of Fannie Bonds, the Assistant United States Attorney stated:

> The government's primary position and I will state it right now, based on the testimony that there apparently is an ownership interest or some kind of possessory interest by the defendant in the residence based on the government's evidence. So I don't think standing is any longer an issue. The gist of the government's contention is that the exigent circumstances justified Agent Melick's warrantless entry.

Transcript at 89.

Later the government indicated that should the court find the warrantless entry improper, "the government would go to alternative arguments which would include inevitable discovery based on the consensual search." (*Id.*)

The Magistrate subsequently recommended to this Court that the motion to suppress be granted because the facts of the warrantless entry did not amount to exigent circumstances. (Recommendation at 13). Even though the Magistrate found that "... Melick entertained some concern for Fannie Bonds' well being ...", "... on an objective level, there simply are not facts which could reasonably lead to the conclusion that anyone was inside the apartment in immediate danger." (Recommendation at 12–13). Further, with respect to the issue of a consensual search, the Magistrate credited Fannie Bonds' testimony that she never told Craig "it was okay to search the apartment." (Recommendation at 14). The government filed its objection and requested a *de novo* evidentiary hearing. In its brief, the government contends that the Magistrate "ignored key facts" and made "factual errors in the disposition of the consent issue." (Objection at 2, 5). In addition, the government raised the theory of inevitable discovery. (Objec-

---

**5.** Brown has conceded that an agent brought the photograph from his bedroom to show it to him.

(Transcript at 96).

tion at 5). Brown's response in support of the Recommendation does not address the issue of inevitable discovery. After review of the entire record, and in particular the hearing transcript, this Court concluded that further briefing was necessary on the issue of Brown's "standing" to contest the validity of the search. While the Court framed the issue as one of "standing", it is more properly analyzed as a matter of substantive Fourth Amendment jurisprudence. *See, Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978); *United States v. McBean,* 861 F.2d 1570, 1573 (11th Cir.1988); *United States v. Peters,* 791 F.2d 1270, 1280 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986). Brown suggests that the Court should not have raised the issue because the government "waived" standing. (Supplemental Brief at 1). Despite the government's concession, (Transcript at 89), it would be error if the Court failed to address the "threshold" question of whether Brown had manifested a "subjective expectation of privacy." *McBean* at 1573–74. In *McBean,* the Eleventh Circuit reversed the district court's suppression order because it failed to "explicitly address ... the threshold issue in this case: whether McBean had a legitimate expectation of privacy in the luggage and is contents." (*Id.*)

Brown argues that the government conceded "that there apparently is an ownership interest or some kind of possessory interest by the defendant in the residence". (Supplemental Brief at 1; Hearing Tr. at 89). Brown misstates the issue. In the case at bar, as in *McBean,* there is no dispute as to the existence of a "possessory" interest; it is agreed that Brown lives in Apartment 203 with his mother Fannie Bonds. Rather, the issue before the Court is whether Brown's words and actions immediately prior to the warrantless search preclude a subsequent Fourth Amendment challenge.

## ANALYSIS

■ The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Constitution, amend. IV. There are exceptions to the warrant requirement. The government has argued that "exigent circumstances"—a concern for the well-being of Fannie Bonds—justified the agents' entrance into the apartment prior to obtaining a warrant. The Magistrate determined that insufficient objective facts existed "which could reasonably lead to the conclusion that anyone was inside the apartment in immediate danger." (Recommendation at 12–13). The Court agrees and incorporates herein by reference the Magistrate's analysis on pages 6–13 of the Recommendation. Nevertheless, it is important to note that the agents' initial search was consistent with their stated concern and not a search for drugs. And while the circumstances of that search do not meet the legal requirements of exigent circumstances, their subsequent actions were wholly consistent with a reasonable belief that Fannie Bonds may have been in danger. (Recommendation at 12–13).

The Magistrate also rejected the government's argument that Fannie Bonds consented to the search by concluding that Fannie Bonds' response to Craig's request was not "a knowing and voluntary consent to search." (Recommendation at 15). The Court accepts that determination.

### Disclaimer of Interest

■ The Court now turns to the issue addressed in the supplemental briefing; whether Brown's behavior produced a disavowal of any connection to Apartment 203 precluding his right to a subsequent Fourth Amendment challenge, (*i.e.,* did Brown's words and actions prior to the search demonstrate a failure to manifest a "subjective expectation of privacy" in Apartment 203?) "Law enforcement officers seeking to search private property must respect a 'legitimate expectation of privacy' in that property." *United States v. Rush,* 890 F.2d 45, 48 (7th Cir.1989), citing *Rakas, supra.* Whether an individual has a "legitimate expectation of privacy" involves two questions:

The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy'—whether ... the individual has shown that 'he seeks to

preserve [something] as private.' The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable'—whether the individual's expectation, viewed objectively, is 'justifiable' under the circumstances.[6] *Peters, supra* at 1281, citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (and the cases therein).

■ The circuits uniformly agree that an individual may forfeit a privacy interest in property by abandonment or a denial of ownership. *United States v. Miller*, 589 F.2d 1117 (1st Cir.1978); *United States v. Lee*, 916 F.2d 814 (2d Cir.1990); *United States v. Rickus*, 351 F.Supp. 1379 (E.D.Pa.1972); *United States v. Washington*, 677 F.2d 394 (4th Cir. 1982); *United States v. Berd*, 634 F.2d 979 (5th Cir.1981); *United States v. Rem*, 984 F.2d 806, 810–811 (7th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *United States v. Morales*, 737 F.2d 761 (8th Cir.1984); *United States v. Veatch*, 674 F.2d 1217 (9th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); *United States v. Jones*, 707 F.2d 1169 (10th Cir.), *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983); *McBean, supra.*

■ Even though the case at bar is different from the cited cases in that it involves real property (the apartment), which requires a closer Fourth Amendment scrutiny, there is no reason why the analysis should be any different than a luggage or automobile case. Just as, for example, a drug courier waives the protection of the Fourth Amendment when he seeks to disassociate himself from luggage containing contraband, so too does a defendant who diverts police scrutiny away from his dwelling place by disavowing any connection thereto. This follows from the principle that a defendant who leads law enforcement officers to believe that a warrant is not required because he fails to manifest an interest in the place or thing to be searched, may not subsequently claim the protections of the Fourth Amendment. While there are few cases dealing with disclaimers of interest in a dwelling place, the Seventh Circuit in *Hayes v. Cady*, 500 F.2d 1212 (7th Cir.), *cert. denied*, 419 U.S. 1058, 95 S.Ct. 642, 42 L.Ed.2d 655 (1974), indicated that a defendant's disclaimer of an interest in a room, coupled with the landlady's consent, precluded a subsequent Fourth Amendment challenge. *Id.* at 1214.[7]

■ In examining whether an individual has relinquished a reasonable expectation of privacy, courts are to examine the "totality of the circumstances." *Rem, supra* at 810–811. Such an inquiry requires the Court to consider whether the officers "were justified in concluding that [the defendant] had no expectation of privacy...." *Id.*, citing *Rush, supra.* The inquiry focuses on the *objective* manifestations of the defendant's intent. *Rem* at 811, n. 2. Therefore, the Court must examine the objective facts known to the police officers immediately prior to the search. In the case at bar, the issue is whether the "circumstances indicated to the police that [Brown] had no justified expectation of privacy [in the apartment]." *Id.*

When Chris Johnson was taken into custody, he was carrying a loaded pistol and crack cocaine. Found in the car was a rental agreement in the name of Fannie Bonds, a woman he claimed he didn't know. He told the agents that an individual named "Ty" who lived in the vicinity of 95th and Brown Deer was his supplier. When the agents arrived in that area and approached Brown, he denied knowing Fannie Bonds and pointed away from Apartment 203 in response to their questions. Despite Brown's testimony that he told agent Melick that Fannie Bonds was his mother and that he lived in Apartment 203, the Magistrate rejected it as "implausible." (Recommendation at 4). As stated by the Magistrate, "Melick's subsequent actions are consistent [with the] ... conten-

---

6. An individual's expectation of a right to privacy in his home is one that society clearly recognizes as reasonable. This case deals primarily with a forfeiture of that right.

7. The Seventh Circuit declined to "decide whether petitioner's disclaimer would have been a sufficient consent in the absence of any other justification for search, or a permanent waiver of his Fourth Amendment rights." *Hayes* at 1214.

tion that Brown never told him who Fannie Bonds was or where he lived." (*Id.*). The Magistrate accepted agent Melick's testimony that Brown pointed away from the building in which Apartment 203 was located. (Hearing Tr. at 16–18) The Magistrate concluded, "Melick's subsequent actions are consistent with uncertainty regarding Brown's place of residence." (Recommendation at 4). Further support for this conclusion is found in Brown's own testimony. Brown testified that after the search of the apartment agent Melick returned to the street and showed Brown a photograph of Brown that had been removed from the apartment.

> He was like, you know who this is? I said, yes, picture of me and my friend. That's how I knew for a fact that he went in my room. . . .

Transcript at 96.

The fact that an agent returned to show Brown the photograph provides compelling support for the factual conclusion that the Magistrate reached, *i.e.*, that Brown mislead Melick into believing that he resided somewhere other than in the apartment building located at 9010 N. 97th Street, and specifically, Apartment 203 of that building.

█ While it is true that Brown did not make a specific denial of ownership as is typical of the luggage cases, it is clear from the "totality of the circumstances" that he failed to manifest an expectation of privacy in Apartment 203. Conclusive of this failure is the fact that Brown was standing virtually in front of the building where Apartment 203 is located and in response to a question about where he lived, pointed away from that building. The Court does not hold that an individual has an affirmative duty to spontaneously communicate where he lives.[8] However, in the case at bar, all of the evidence supports the conclusion that Brown disavowed any connection to Apartment 203 in response to agent Melick's questioning. Further, as the Magistrate noted, agent Melick's subsequent actions were consistent with the contention that "Brown never told him who Fannie Bonds was or where he lived." Brown's own recollection of an agent confronting him with his photograph confirms that conclusion.

█ In addition to the above, Melick testified that Brown told him that he was locked out of his apartment, yet when Brown was placed under arrest, a key chain was found. Such a discovery would not only heighten Melick's concern for Fannie Bonds' safety, but reinforce the objective belief that Brown did not live there. In addition, whether Brown specifically denied knowing Fannie Bonds (as the Magistrate implicitly concluded—Recommendation at 4), or simply exercised his constitutional right to remain silent (as Brown alleges—supplemental brief at 4), when considered in light of the agent's possession of the car rental receipt which indicated that Fannie Bonds resided in Apartment 203, Brown's "manifestations" fell far short of demonstrating an objective intent to keep Apartment 203 inviolate.[9] The

---

8. In this regard, Brown cites *Walter v. United States*, 447 U.S. 649, 658 n. 11, 100 S.Ct. 2395, 2402 n. 11, 65 L.Ed.2d 410 (1980) for the proposition that the Court may not "equate an unwillingness to invite a criminal prosecution with a voluntary abandonment of . . . [a Fourth Amendment interest]." In *Walter*, the government argued that the defendants' failure to make a prompt claim for the return of some obscene films was tantamount to abandonment. *Walter* is both factually distinguishable from, and logically consistent with, this Court's holding. In *Walter*, the police already had the incriminating evidence in their possession as a result of the unlawful search and the defendants' failure to make a *post-seizure* claim for their return was excusable and did not amount to a disclaimer of interest. In the case at bar, Brown's disclaimer was *prior* to the search and the statement, "I live in apart-

ment 203", is notably different from "those obscene films belong to me." *Walter* is inapposite.

9. Brown's assertion of his Fifth Amendment right to remain silent (keeping in mind that this Court adopts the Magistrate's ruling that he did not) only serves a Fifth Amendment purpose (*i.e.*, the prevention of self-incrimination.) It goes no further. It cannot be objectively viewed as an effort on Brown's part to establish an expectation of privacy under the Fourth Amendment. While it is true that a person enjoys the right to remain silent, if that silence succeeds in contributing to misleading police officers such that they believe the person has no expectation of privacy in the place to be searched, the Fourth Amendment provides no refuge. This is true even if as Brown has argued the exercise of his Fifth Amendment right cannot be deemed a "disavowal of his possessory interest" (Brief at p. 4).

exclusionary rule, as grafted onto the Fourth Amendment, operates to deter unlawful police conduct. It only requires police officers to procure a warrant prior to conducting a search subject to limited exceptions. But neither the exclusionary rule nor the Fourth Amendment expects law enforcement agents to be omniscient. The agents' belief that Brown did not live in Apartment 203 was, under the totality of the circumstances, objectively reasonable given all of the evidence.

 When an individual misleads the police and by his conduct effectively denies any connection to a dwelling place, he may not later complain that the agents should have obtained a warrant. Just as law enforcement agents may not enjoy the "fruit of the poisonous tree," so too an individual who attempts to distance himself from a place or thing, cannot later claim that he manifested an objective intent to keep the place or thing private.

### Inevitable Discovery

Even if Brown had manifested a subjective expectation of privacy such that he may claim the protections of the Fourth Amendment, there is a second basis for denial of the motion. The government raised, but did not argue until its opposition brief, the issue of whether the warrantless search is excused under the doctrine of inevitable discovery. The Magistrate did not have an opportunity to consider this issue and Brown failed to respond to it.

In *Nix v. Williams,* 467 U.S. 431, 443–444, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984), the Supreme Court examined the exclusionary rule and the independent source doctrine and concluded that the evidence should not be excluded if it would have been "inevitably discovered" without the unlawful actions and when exclusion "would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place." The government argues that the exclusionary rule

should not apply in this case because "the discovery would have been inevitable through a warrant not relying on Melick's exigent entry into the apartment...." (Objection at 6).

 In *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), the court discussed the distinction between the "independent source" and "inevitable discovery" doctrines. The independent source doctrine dictates that evidence which is received through an illegal source is admissible if it is also received through an independent source. However, if the evidence is not found through an independent source but would have been inevitably discovered, it is equally admissible. *Id.* at 539, 108 S.Ct. at 2534, discussing *Nix v. Williams, infra.* Therefore, "[t]he inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray,* at 539, 108 S.Ct. at 2534. In *Murray,* federal law enforcement agents, without a warrant, entered into a warehouse and observed bales of marijuana.[10] The agents left, secured the premises, and awaited the arrival of a search warrant which eventually issued. In remanding, the Supreme Court held that the evidence would be admissible under the independent source doctrine if the decision to seek the warrant was not prompted by what the agents saw during the unlawful entry or the information obtained was not presented to the Magistrate and affected his decision to issue the warrant. *Id.* at 542, 108 S.Ct. at 2536.

 In the case at bar, as in *United States v. Buchanan,* 773 F.Supp. 1207 (W.D.Wis.1989), because the subsequent warrant utilized information gained as a result of the unlawful entry, the independent source doctrine does not apply. Instead, admission is predicated on a theory of inevitable discov-

---

**10.** As is true in the case at bar, the Court noted the following: "While they (the agents) may have misjudged the existence of exigent circumstances to justify the warrantless entry (the Court of Appeals did not reach that issue and neither do we), there is nothing to suggest that they went in merely to see if there was anything worth getting a warrant for." *Murray* at 540, n. 2, 108 S.Ct. at 2534, n. 2.

ery because a neutral magistrate *would have* issued a warrant based on information other than that acquired as a result of Melick's unlawful entry.

In *Buchanan,* police officers armed with an arrest warrant for murder charges, proceeded to a Madison hotel where Buchanan was staying. On a pretext, the manager lured Buchanan from his room and the officers placed him under arrest. Buchanan requested that the officers retrieve his clothing from the room. In doing so, they discovered a three-beam scale and small packets containing cocaine. They stopped packing immediately and obtained a warrant. The subsequent search revealed 125 grams of cocaine. He was charged and convicted with possession and intent to distribute. The Magistrate recommended that Buchanan's motion to suppress be denied even though the initial search (while packing) was unlawful, because the "officers would have sought a search warrant for the murder weapon." *Buchanan,* 773 F.Supp. at 1212. In affirming, the Seventh Circuit stated that:

> [I]t was reasonable to believe that a search of Buchanan's hotel room had a fair chance of discovering the gun used in the Ohio murder. The narcotics would inevitably have been found in a search for the gun.

*United States v. Buchanan,* 910 F.2d 1571 (7th Cir.1990).[11]

The facts of our case, as those of *Buchanan,* differ from *Murray* on a significant point. In *Murray,* a warrant was actually obtained which apparently did not rely on information gained from the unlawful search. Indeed, the case was remanded to determine that factual issue. *Murray* at 542, 108 S.Ct. at 2536. Because the warrants in this case and in *Buchanan* apparently relied upon information gained as a result of an unlawful search, they are not independent source cases (like Murray), but inevitable discovery cases. *Buchanan* affirmed the admission of the evidence because a warrant inevitably would have been sought and obtained be-

cause probable cause existed to search for the murder weapon. Despite the Sixth Circuit's critique, *Buchanan* is the law of this Circuit and the Court is bound thereby.

Applying *Buchanan* to the case at bar requires the consideration of two subsidiary questions: whether the agents would have inevitably sought a search warrant for Apartment 203; and second, would a neutral magistrate have issued such a warrant. *Buchanan,* 910 F.2d at 1573. The government must be able to carry its burden of showing by a "preponderance of the evidence that a warrant could and would have been obtained without regard to any antecedent illegality." *Id.* at 1211, citing *United States v. Silvestri,* 787 F.2d 736, 744–745 (1st Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988).

 It seems certain that the agents would have sought a search warrant for Apartment 203. The more difficult question is whether a neutral magistrate would have issued a warrant based on the information known independently of Melick's unlawful entry. A finding of probable cause is easily satisfied.

> For probable cause to exist, a magistrate need not determine that the evidence sought is in fact on the premises to be searched ... or that the evidence is more likely than not to be found where the search takes place.... The Magistrate need only conclude that it would be reasonable to seek evidence in the place indicated in the affidavit.

*United States v. Peacock,* 761 F.2d 1313, 1315 (9th Cir.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985).

The government has argued that a "state court judge would have had the following facts": (1) that Brown and Johnson had participated in a crack cocaine transaction; (2) that Johnson told the officers that the crack had recently been cooked—requiring a loca-

---

11. The holding in *Buchanan* was recently criticized. In the *United States v. Johnson,* 22 F.3d 674, 684 (6th Cir.1994), the Sixth Circuit rejected *Buchanan* as a "radical departure from the Fourth Amendment warrant requirement precedent." The Sixth Circuit reasoned that, "to hold

that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause." *Id.* at 683.

tion for the cooking; (3) that Brown was Johnson's supplier; (4) that Brown lived in Apartment 203; and (5) that Apartment 203 contained illegal drugs. With respect to Brown's residence, it seems inconsistent for the government to assert that the agents would have represented to a state court judge, independent of Melick's unlawfully gathered information, that Brown lived in Apartment 203. But consider the following. When Melick placed the key into the key-hole [12] and discovered that it worked, he knew one of two things could be true: either Brown lived there (which would force Melick to disregard Brown's previous words and actions); or that his initial hunch—that Brown had taken over Fannie Bonds' apart-ment—was probably correct. In any event, if either scenario had been presented to a state court judge, it would have supported the issuance of a warrant.

 The government contends that the final piece of information—that Apartment 203 contained illegal drugs would also have been presented to the state court judge be-cause agent Craig, in securing the premises, entered the apartment with Fannie Bonds and saw drugs in plain view. The govern-ment argues that agent Melick was permit-ted to secure the premises to prevent the destruction or removal of evidence. (Objec-tion at 5, citing *Segura v. United States,* 468 U.S. 796, 810, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599 (1984)). Therefore, his observa-tions would have been pursuant to a lawful entry and subsequently presented to the judge. The government's reasoning is flawed. In *Segura,* the Supreme Court held that the securing of a dwelling is permissible, *"on the basis of probable cause,"* to prevent the destruction or removal of evidence. *Id.* at 810, 104 S.Ct. at 3388. (emphasis added). The government can not argue that the drugs seen by agent Craig support probable cause when his presence in the apartment required *prior* probable cause to secure the premises. Nevertheless, the Court is satis-fied that a preponderance of the evidence shows that the information gathered up to the time of (and including) Melick's insertion of the key into the keyhole, would have pro-vided a sufficient basis for a state judge to have "conclude[d] that it would be reasonable to seek evidence in [apartment 203]." *Pea-cock, supra.* Therefore, under *Buchanan's* inevitable discovery holding, the evidence re-covered from Apartment 203 should not be suppressed as a warrant would inevitably have been procured.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY OR-DERED THAT:**

1. Tyrond Brown's motion to suppress is **DENIED;** and

2. The case will be scheduled for trial.

**SO ORDERED.**

---

12. While an individual does enjoy a privacy in-terest in a keyhole, that interest is so small that officers do not need probable cause to search it. *United States v. Concepcion,* 942 F.2d 1170, 1173 (7th Cir.1991). Accordingly, Melick's action in doing so was not unlawful and the knowledge gained thereby may be used to decide whether a warrant would have issued.